**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

| | | |
|---|---|---|
| RODOLFO GODINEZ, | : | |
| | : | |
| Petitioner, | : | Civ. No. 18-15402 (KM) |
| | : | |
| v. | : | |
| | : | |
| STEVEN JOHNSON, et al., | : | **OPINION** |
| | : | |
| Respondents. | : | |

---

**KEVIN MCNULTY, U.S.D.J.**

**I.    INTRODUCTION**

Pro se Petitioner Rodolfo Godinez is a state prisoner serving a 245-year sentence for murder, robbery, and related crimes seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (DE 1.) Petitioner has also filed separate motions seeking pro bono counsel and to amend his petition (DEs 19, 21.). For the following reasons, the petition and motions will be denied without a hearing or certificate of appealability.


**II.    BACKGROUND**

On direct appeal, the New Jersey Superior Court, Appellate Division, summarized Petitioner's state criminal proceedings and the relevant evidence underlying his convictions as follows:

> On the evening of August 4, 2007, N.A., age nineteen, her brother Terrance Aeriel, age eighteen, along with Dashon Harvey, and Iofemi Hightower, both age twenty, spent the evening together. N.A., Aeriel and Harvey attended Delaware State University (DSU), and were members of DSU's marching band;[1] Hightower had also applied to DSU and anticipated receiving a band scholarship and commencing her studies in the fall.
>
> The group left Vailsburg Park at closing and N.A. drove the group to the Mt. Vernon School playground. She parked in the schoolyard under a streetlight, near a set of stairs. When she exited her car, N.A. noticed two Hispanic men later identified as [Petitioner] and Jovel, wearing white t-shirts and jeans, sitting on the bleachers. The two were talking and one was drinking a beer.

As N.A. and her friends were "minding [their own] business," one of the men offered her a beer, which she declined. N.A., Harvey and Hightower were sitting on the steps and Harvey began dancing. The men smiled and laughed at him. Throughout the evening, Aeriel went from the area near the steps to the monkey bars, approximately fifty feet away, as he talked on his cell phone. In doing so, he passed in front of [Petitioner] and Jovel on the bleachers.

After thirty minutes, Aeriel, who "was standing on top of the monkey bars," texted N.A.: "It's time to go." N.A. looked toward Aeriel and saw that four additional young males had entered the school parking lot. She described three of the men, later identified as Alfaro, Gomez, and Carranza, as "Spanish," wearing white t-shirts; the fourth, later identified as Baskerville, she described as African American, wearing sunglasses and a gray tank top. N.A. texted her brother, asking why they had to leave, but Aeriel was already walking toward the car at "a fast pace" with a "real serious" look on his face. As Aeriel walked, the four newcomers were behind him. Aeriel continued toward N.A.'s car and the four men veered toward the bleachers. N.A. saw [Petitioner] and Jovel stand as the four approached and the group talked amongst themselves. Convinced her brother was "uncomfortable," N.A. told the others it was time to leave and asked Aeriel to drive.

The six men were members of the Mara Salvatrucha gang, commonly known as MS–13. At [Petitioner]'s direction, the gang rushed toward the four friends as they opened the doors to their vehicle. The assailants told the four victims "to get the fuck on the ground," then repeatedly ordered them to surrender their possessions. The assailants circled the car, as Aeriel and Harvey laid face down on one side of the vehicle, N.A. and Hightower laid face down on the other. The attackers yelled, "don't hold nothing back," and made threats to kill anyone who did not cooperate. The four friends complied with the demands.

N.A. observed two assailants held handguns. Other evidence revealed Jovel had a .357 magnum Colt revolver, Gomez had an inoperable .32 caliber revolver, Alfaro wielded a machete, and Carranza had a twelve-inch kitchen knife.

The gang emptied the victims' pockets, taking money, identification, credit cards, valuables, and cell phones. N.A. told them her purse was in the car, which they retrieved, and then ripped her gold chain from her neck.

Baskerville and another assailant unsuccessfully attempted to remove Hightower's pants. The two then turned to N.A., pulling down her basketball shorts. Baskerville and one of the others began digitally penetrating N.A., who repeatedly yelled "Jesus." She was told to "shut the fuck up" and did not resist during the sexual assault stating she feared for her life.

N.A. looked under the car and saw Aeriel and Harvey stand up and walk toward the nearby steps. She next recalled an attacker put his "knee in [her] back, pulled [her] hair up, and was trying to chop [her] neck off with a machete." N.A. fought

back, yelled "[d]on't do that, like get off me[,]" and she stood up. At that point, she did not see Hightower. She then heard two gunshots from the stairwell. N.A. moved toward the steps and was shot in the head, the bullet striking behind her left ear. N.A. fell to the ground and eventually passed out.

That evening, Michael Yancey, who lived on the second-floor of a two story house located in front of the Mt. Vernon school, was awakened at 11:20 p.m. While in his bathroom, he heard the cries of a young woman coming from the schoolyard, begging for mercy, stating, "[d]on't do that" and "[p]lease, why you want to do that?" Yancey initially thought it was his neighbor arguing with his girlfriend. Then, the woman's voice grew angry and her tone "harsh." "A couple of minutes later," he heard four successive gunshots. He ran to his daughter's bedroom to better view the schoolyard, and saw a group of five or six men, wearing blue jeans with white t-shirts, pass by the window as they ran from the scene. Yancey described one of the men as African–American and characterized the others as "Indian or Mexican." Yancey called 9–1–1.

At 11:40 p.m., Newark Police officers were dispatched to the Mt. Vernon School. They found Aeriel, Harvey, and Hightower dead and N.A. seriously wounded lying in a pool of blood, conscious, but unresponsive. Autopsies determined Hightower died from a gunshot wound to the neck and "sharp-force" injuries to the face, head, and upper extremities; Aeriel died from a gunshot wound to the neck; and Harvey died from a gunshot wound to the head.

On August 5, 2007, between midnight and 1:00 a.m., the two lead detectives, Kevin Green of the Essex County Prosecutor's homicide squad and Lydell James of the Newark Police Department's homicide unit, arrived on scene. Police processed the schoolyard and gathered available forensic evidence. Detective Green later obtained communication data warrants for the victims' cell phones. Harvey's phone was found active and police used the phone's GPS to track it to a residence adjacent to the school. A police tracking dog later followed a scent to an area in the vicinity of what was later determined to be [Petitioner]'s residence.

As the police investigation continued, they received a tip that led to the discovery of a machete in another area of the schoolyard. The .357 magnum Colt revolver used to shoot the four victims was also found in Alvarado Lobo Delgado's residence in Suffolk County, New York.

Gomez, who was then fifteen years old, was the first arrested. Carranza, then twenty-eight, turned himself in the following day. Later, Baskerville, then also fifteen, and Jovel were arrested.

Detectives Green and James learned [Petitioner] and Alfaro, then sixteen, had fled to Maryland and Virginia respectively. Detective Green apprehended Alfaro in Woodbridge, Virginia and Detective James, joined by members of the United States Marshals' Task Force, located [Petitioner] in a Maryland apartment.

3

Prior to trial, [Petitioner] moved to suppress custodial statements he made to police following his arrest. [Petitioner] also sought to exclude references to his alleged gang membership. [Petitioner]'s motions were denied, based on the State's evidence, as presented in separate evidentiary hearings.

[Petitioner] was the first of the six men tried. Following the completion of extensive jury selection, Judge Michael L. Ravin presided over the trial that began on April 27, 2010, and concluded when the jury rendered its guilty verdicts on May 24, 2010. [Petitioner] moved for a new trial, which was denied. Thereafter, the sentence imposed included three consecutive life terms for the three murders and a consecutive twenty-year term for attempted murder. This appeal ensued.

*State v. Godinez*, No. A-6205-09T4, 2014 WL 1302366, at *1–4 (N.J. Super. Ct. App. Div. Apr. 2, 2014) (the "Direct Appeal").

The New Jersey Supreme Court subsequently denied certification on October 9, 2014. 220 N.J. 40 (2014). Petitioner filed a state petition for post-conviction relief ("PCR") on April 27, 2015, and later moved for a new trial based on newly discovered evidence. (DE 9-23 at 45.) Judge Ravin conducted an evidentiary hearing and denied both (DE 9-22 at 6.) In its decision affirming Judge Ravin, the Appellate Division detailed that sequence:

[Petitioner] moved for a new trial, which the trial judge, Judge Ravin, denied. [Petitioner] was then sentenced to three consecutive terms of life in prison for the murder convictions and a consecutive term of twenty years in prison for the attempted murder conviction. [Petitioner] will be ineligible for parole for over 200 years.

As previously noted, [Petitioner] filed a direct appeal challenging his convictions and sentences. We rejected [Petitioner]'s arguments and affirmed his convictions and sentences.

In 2015, [Petitioner] filed a self-represented petition for PCR. He was assigned counsel. [Petitioner] also filed a motion for a new trial, contending that there was newly discovered evidence consisting of an exculpatory statement from co-defendant Melvin Jovel.

The State consented to an evidentiary hearing and Judge Ravin granted the hearing to address both [Petitioner]'s motion for a new trial and his PCR petition. At the hearing, Jovel and [Petitioner]'s trial counsel testified.

Shortly after the murders in 2007, Jovel gave a detailed statement in which he told the police that [Petitioner] was the leader and gave the directions on the night of the crimes. Thereafter, Jovel pled guilty to the murders and attempted murder. He was sentenced to an aggregate prison term of over 200 years. At his sentencing, Jovel suggested that [Petitioner] might not have been responsible for the crimes.

4

In 2015, he provided PCR counsel with a certification disavowing his 2007 statement, and asserting that [Petitioner] had nothing to do with the crimes that occurred on August 4, 2007.

At the evidentiary hearing, Jovel testified that he was eighteen years old at the time of the crimes and younger than most of his co-defendants, including [Petitioner]. Jovel denied that he or any of his co-defendants were gang members, but acknowledged that [Petitioner] was present in the school yard when the robberies and murders took place. He stated, however, that he alone was responsible for the shootings. Indeed, he testified that he acted alone and that [Petitioner] tried to stop him from committing the murders. He also contended that the statement he gave in 2007 implicating [Petitioner] was a lie.

Trial counsel for [Petitioner] testified that [Petitioner] told him before trial that Jovel might be prepared to exculpate him. When trial counsel tried to contact Jovel, however, Jovel's counsel did not give him permission to speak with Jovel.

Trial counsel also testified about his representation of [Petitioner] at trial. Specifically, counsel explained his forty-one years of experience as a criminal defense attorney, his efforts to deal with the public notoriety of [Petitioner]'s case, his efforts to exclude and limit the gang-related evidence against [Petitioner], his effort to address [Petitioner]'s incriminating statement, his evaluation of issues that arose during jury deliberations, and his strategies and strategic decisions made at trial.

After hearing the testimony, Judge Ravin first addressed [Petitioner]'s motion for a new trial in a detailed written opinion issued on March 1, 2016. The judge found Jovel's testimony not to be credible. Specifically, he analyzed how Jovel's testimony at the hearing was inconsistent and made no sense. He also pointed out that the testimony at the evidentiary hearing was totally inconsistent with the detailed statement Jovel gave in 2007 shortly after the murders. In that regard, Judge Ravin found that Jovel's testimony was so incredible that no reasonable jury would accept the exculpatory testimony and reject the "overwhelming evidence of [[Petitioner]'s] guilt." In particular, Judge Ravin pointed out that the jury heard detailed evidence, including [Petitioner]'s own incriminating statement and the admission that [Petitioner] made to a fellow jail inmate.

In a separate opinion issued on March 2, 2016, Judge Ravin analyzed [Petitioner]'s PCR petition. Judge Ravin found the testimony of [Petitioner]'s trial counsel credible. The judge then reviewed each of [Petitioner]'s PCR arguments, including arguments made by PCR counsel and arguments made in [Petitioner]'s pro se supplemental brief. Judge Ravin found no evidence to support [Petitioner]'s claims that his trial counsel had been ineffective in (1) dealing with issues that arose during the jury's deliberations; (2) not requesting a separate jury instruction on the gang expert's testimony; (3) failing to object to the prosecutor's comments concerning [Petitioner]'s failure to "provide answers" and other indirect comments about [Petitioner]'s decision to remain silent; (4) failing to adequately

inquire into the destruction of notes prepared by law enforcement officers; (5) failing to object to the surviving victim's testimony about her sexual assault; (6) failing to request Judge Ravin's recusal; (7) failing to point out that an officer might have lied about where a machete was found; (8) failing to point out that the surviving victim allegedly lied in her testimony; and (9) failing to move to have Jovel's matter proceed first. Judge Ravin also analyzed and rejected [Petitioner]'s arguments about the alleged ineffective assistance of his appellate counsel.

*State v. Godinez*, No. A-3972-15T1, 2018 WL 333490, at *1–2 (N.J. Super. Ct. App. Div. Jan. 9, 2018) ("PCR Appeal").

After the Appellate Division affirmed Judge Ravin's decisions, the New Jersey Supreme Court denied certification on June 15, 2018. 233 N.J. 603, 187 A.3d 844 (2018). Petitioner did not seek review by the Supreme Court of the United States, instead filing this Petition on October 26, 2018. (DE 1.) Respondents answered (DEs 7-9), and Petitioner replied. (DE 14.)

Nearly two years after filing a reply, Petitioner filed an application for an evidentiary hearing (DE 15),[1] which Respondents opposed. (DE 16.) Petitioner replied. (DE 18.)

Petitioner subsequently filed a motion for pro bono counsel, which Respondents also opposed. (DEs 19, 20.) Finally, Petitioner also filed a motion to amend the Petition to include additional claims, which Respondents also opposed. (DEs 21, 22.) According to the motion, Petitioner filed a second PCR in state court to exhaust the additional claims. Those additional claims were denied, and the denial was affirmed by the Appellate Division. The New Jersey Supreme Court denied certification.

## III.    STANDARD OF REVIEW

An application for a writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution, laws, or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104–132, 110 Stat. 1214, federal habeas corpus relief is unavailable for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an

---

[1] Petitioner's second such request (DE 17) is substantively identical to the first.

unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, courts must "first decide what constitutes 'clearly established federal law, as determined by the Supreme Court of the United States.'" *See Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable-application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Petitioners have the burden of proof and, with respect to § 2254(d)(1), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *See id.*

In applying AEDPA standards, the relevant state court decision for federal habeas review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256. 289-90 (3d Cir. 2008). Courts must assume that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018). Additionally. AEDPA deference is not excused when state courts issue summary rulings. For example, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 62 U.S. 86, 99 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of

the State." *See* 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." *See Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citation omitted). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *See id.* (citations omitted). To the extent that a petitioner's constitutional claims are unexhausted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn.* 504 F.3d 416, 427 (3d Cir. 2007); *Bronshtein v. Horn*, 404 F.3d 700. 728 (3d Cir. 2005).

If a court does not dismiss the petition at the screening stage, the court "must review the answer, any transcripts and records ... to determine whether" the matter warrants an evidentiary hearing. Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts (made applicable to proceedings under § 2241 by Rule 1(b)). "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

Moreover, as the Supreme Court recently held, if a prisoner failed to develop the factual basis of a claim in state proceedings, a federal court may admit new evidence only in two situations: (1) a "new" and "previously unavailable" "rule of constitutional law" made retroactively applicable by this Court; or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence." § 2254(e)(2)(A). "And even if a prisoner can satisfy one of those two exceptions, he must also show that the desired evidence would demonstrate, 'by clear and convincing evidence,' that 'no reasonable factfinder' would have convicted him of the charged crime." § 2254(e)(2)(B). "Thus, although state prisoners may occasionally submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." *Shoop v. Twyford*, No. 21-511, --- S.Ct. ----, 2022 WL 2203347, at *5 (U.S. June 21, 2022).

## IV.    DISCUSSION

### A.  Pre-trial claims

### 1.  Ground one: *Miranda/*Fifth Amendment

Petitioner argues that "the trial court erred in refusing to suppress [his] statements to police on *Miranda* and Fifth Amendment grounds." (DE 1 at 7.) Specifically, Petitioner argues:

8

(1) that any statements he gave to officers should have been excluded because they interrogated him while in custody before issuing *Miranda* warnings; and (2) that Petitioner's subsequent waiver of *Miranda* rights were not proven to be knowing, voluntary, and intelligent. (*Id.*) Petitioner raised this claim prior to trial, before the Appellate Division on direct appeal, and in his petition for certification to the New Jersey Supreme Court on direct appeal. (DE 9-17 at 1; DE 9-20 at 37.) Petitioner argues that the trial court erred in declining to exclude his statements to police between arrest and waiver of his *Miranda* rights on the basis that Petitioner was "not subject to express questioning or its functional equivalent." (DE 1 at 7.)

Statements made to a law enforcement officer are inadmissible if the statements are "involuntary." *Schneckloth v. Bustamonte,* 412 U.S. 218, 225–26 (1973); *see also Colorado v. Connelly,* 479 U.S. 157, 165 (1986) (involuntary confessions violate the Due Process Clause of the Fifth and Fourteenth Amendments). A statement is given voluntarily if, when viewed in the totality of the circumstances, it is the product of an essentially free and unconstrained choice by its maker. *Schneckloth,* 412 U.S. at 225; *United States v. Swint,* 15 F.3d 286, 289 (3d Cir.1994). If an individual's will is overborne or that person's capacity for self-determination is critically impaired, the statements are deemed involuntary. *Schneckloth,* 412 U.S. at 225–26. A suspect's background experience, including prior dealings with the criminal justice system, should be considered in the voluntariness inquiry. *See Oregon v. Bradshaw,* 462 U.S. 1039, 1046 (1983) (plurality); *United States v. Velasquez,* 885 F.2d 1076, 1086 (3d Cir.1989). A necessary predicate to a finding of involuntariness is coercive police activity. *Connelly,* 479 U.S. at 167. Further, there must be some causal connection between the police conduct and the confession. *Id.* at 164.

Where the question presented in a section 2254 proceeding is whether a confession admitted at trial was voluntary and in compliance with *Miranda,* with respect to issues of underlying or historic facts, the state court findings, if fairly supported in the record, are conclusive. There will be, however, an independent federal determination of the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution. *Miller v. Fenton,* 474 U.S. 104, 110–14, 116–18 (1985). "[S]ubsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings, often require the resolution of conflicting testimony of police and defendant. The law is therefore clear that state-court findings on such matters are conclusive on the habeas

court if fairly supported in the record and if the other circumstances enumerated in § 2254(d) are inapplicable." *Id.* at 117.

An evidentiary hearing on the *Miranda/*voluntariness issue was held in Superior Court on March 10, 2009 before Judge Michael J. Nelson, and on November 4 and 6, 2009 before Judge Michael L. Ravin.[2] (DEs 8-1 to 8-3.) At the hearing, Detective Lydell James of the Newark Police Department testified as a fact witness for the state and Petitioner and his mother testified as fact witnesses for Petitioner. (DE 9-15 at 132-136.) There were two expert witnesses: Dr. Ernesto Perdomo for the state, and Dr. Joel Morgan for Petitioner. (*Id.*)

As relevant here, Judge Ravin found as follows. Newark Police Department Detective Lydell James and various federal law enforcement officials learned that Petitioner and his brother, Alexander Alfaro, were in a Maryland apartment and prepared to flee the country. (*Id.* at 129-30.) Detective James and the others, armed with an arrest warrant, entered the apartment and secured Petitioner and numerous others who were present. (*Id.*) After his arrest and as he was being escorted to a nearby patrol car, Petitioner asked, unprompted, "How did you know I was here? Someone must have told on me." (*Id.*) Petitioner also expressed concern that one of his "'homies" was probably going to harm his mother. (*Id.*) Because Petitioner had been "blurting out information" and had not asked for an attorney, Detective James read Petitioner his *Miranda* warnings, in English, from a card. (*Id.*)

On the way to Prince George's County Jail, Petitioner—again, without any police questioning—told Detective James that he would help find his brother if the police could ensure his brother's and his mother's safety. (*Id.*) At the jail, Detective James made an audiotape of Petitioner's questioning, which included standard *Miranda* warnings provided orally because Petitioner could not read. (*Id.* at 131.) Petitioner's statement contained details of the murders and aftermath. (*Id.*)

The Appellate Division affirmed Judge Ravin's decision and deferred to his factual findings as "well-grounded in the evidence in the record":

> In a written opinion, Judge Ravin made detailed factual findings, which included very specific credibility determinations. He fully evaluated the totality of the evidence, and rejected [Petitioner]'s recitation of events including claims he was questioned before being advised of his rights; his prior alcohol and cocaine

---

[2] The matter was reassigned to Judge Ravin after Judge Nelson was reassigned to a different division. (DE 9-15 at 127.)

consumption incapacitated his comprehension; his intellectual functioning prevented his understanding of his rights; and the assertion that Detective James promised he would keep [Petitioner]'s family safe in exchange for his statement.

The judge found [Petitioner]'s testimony "patently unreasonable," "inherently unreliable, utterly self-contradictory, and unquestionably motivated by self-interest." In his review, Judge Ravin found the State had proven beyond a reasonable doubt police *Mirandized* [Petitioner] when arrested and did not engage in direct questioning or its functional equivalent until he provided the recorded statement. The judge determined once at the station, *Miranda* rights were reissued, so [Petitioner] was properly informed of his rights before he provided his custodial statement. In reaching this conclusion, Judge Ravin credited Detective James's observation [Petitioner] was not under the influence of intoxicants along with his independent assessment of [Petitioner], after he reviewed the video tape. The judge credited Dr. Perdomo's testimony, finding it convincing and consistent with other evidence and noted he considered the videotape evidence. Although accepting Dr. Morgan's test results, Judge Ravin rejected his conclusion that [Petitioner] was unable to understand his *Miranda* rights, primarily because Dr. Morgan did not view [Petitioner]'s videotaped interview or support his testimony with other evidence. *See State v. Carpenter,* 268 N.J. Super. 378, 383–86 (App. Div.1993) (holding a court is not obligated to accept the opinion of a defense expert when contrary evidence, presented by the State's expert, was found credible), *certif. denied,* 135 N.J. 467 (1994).

Based on these findings, Judge Ravin concluded [Petitioner]'s custodial statements were admissible at trial because they were knowingly and voluntarily rendered after waiving his rights. *See State v. A.G.D.,* 178 *N.J.* 56, 67 (2003) (holding the State must prove beyond a reasonable doubt the [Petitioner] waived the right against self-incrimination and that his decision to do so was knowing, intelligent, and voluntary in light of all circumstances); *see also State v. Presha,* 163 N.J. 304, 313 (2000).

*Direct Appeal*, 2014 WL 1302366, at *6–7.

I find no basis to conclude that the state court decisions were contrary to, or involved an unreasonable application of, clearly established federal law. Judge Ravin and the Appellate Division considered and rejected the arguments Petitioner asserts here regarding the events preceding Petitioner's formal interrogation at the jail. This includes Petitioner's contention that any statements should have been suppressed because detectives assaulted or otherwise intimidated him upon entering the Virginia apartment and continued asking "why he had killed those people" in transit to the jail. (DE 1 at 7; DE 9-15 at 135-36.) Judge Ravin rejected Petitioner's testimony as "inherently unreliable, utterly self-contradictory, and unquestionably

motivated by self-interest." (DE 9-15 at 136.) Judge Ravin highlighted numerous inconsistencies in Petitioner's testimony and Petitioner's numerous lies to police. (*Id* at 136-37.)

Judge Ravin also considered and rejected Petitioner's other contention that he had "borderline cognitive abilities, limited education and reading ability," and primarily spoke Spanish. (DE 1 at 7-8; DE 9-15 at 134-35.) Judge Ravin weighed the testimony of Petitioner's expert, Dr. Morgan, against that of the State's expert, Dr. Perdomo. (*Id.*) Judge Ravin credited Dr. Perdomo's conclusion that Petitioner understood his constitutional rights, relying upon three significant facts.

First, Dr. Morgan's opinion was informed substantially by Petitioner's statements and testimony, which Judge Ravin had rejected as unreliable. (*Id.* at 134.) Second, Dr. Morgan did not listen to the recording of Petitioner's interview at the jail, which evidenced Petitioner's ability not only to speak and understand English, but grasp various complex concepts and gang-related idioms. (*Id.* at 135, 139-40.) Finally, Judge Ravin noted that when Petitioner was arrested for an alleged stabbing in Irvington in 2002, "he gave a signed sworn statement in English in which he stated he understood English, although he could not read or write it, and that he understood his Miranda rights." (*Id.* at 134.)

The Petition and Petitioner's reply (DE 14 at 5-10) essentially reiterate the same contentions made and rejected before, as described above: that Petitioner was assaulted and interrogated prior to having received *Miranda* warnings, and that he was incapable of understanding the warnings anyway due to either intoxication or intellectual deficits. However, Petitioner provides no factual or legal basis to disturb the detailed and conscientious fact finding and rulings of the state courts. Accordingly, I will decline to grant habeas relief on Ground One.

## B. Trial claims

### 1. Ground Two: gang evidence

Petitioner next argues that the trial court erred in permitting the jury to hear evidence from the state's expert witness, Investigator Hector Alicea, about Petitioner's alleged gang affiliations and the nature of MS-13. (DE 1 at 9, *et seq.*) Respondent disagrees on the merits, and also asserts its first affirmative defense: that the admissibility of such gang evidence and expert opinion are governed by state evidentiary rules. (DE 7 at 52-63, 129-132.) Ground Two was raised and rejected by the trial court, and then by the Appellate Division and New Jersey

Supreme Court on direct appeal. (DE 9-20 at 35a; DE 9-17 at 2.) I will also decline to grant relief on this claim.

As an initial matter, Respondents are correct that Petitioner's argument appears to be grounded in state evidence rules, although Petitioner does, on reply, cite various federal cases citing federal evidentiary standards, which do not apply in state court. (DE 14 at 10-19.) "Petitions alleging specific errors in state law do not present federally cognizable issues unless the violation is demonstrated to be of constitutional magnitude. *Quintana v. Adm'r*, No. CV 13-7135(JMV), 2017 WL 4329736, at *18 (D.N.J. Sept. 29, 2017) (citing *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law")). A federal court must defer to a state court's interpretation of its own rules of evidence and procedure. *Bisaccia v. Attorney General of New Jersey,* 623 F.2d. 307, 312 (3rd Cir.1980).

Federal standards enter into the analysis, however, when an alleged evidentiary error rises to the constitutional level. "Only when an evidentiary error deprives a [Petitioner] of 'fundamental fairness' in his criminal trial is the error considered to be of constitutional proportion and cognizable in federal habeas corpus proceedings." *Bartholomay v. Beyer*, No. CIV. 91-5176, 1992 WL 184360, at *3 (D.N.J. July 13, 1992) (citing *Donnelly v. De Christoforo,* 416 U.S. 637, 642–43 (1974) ("This is not a case in which the State has denied a [Petitioner] the benefit of a specific provision of the Bill of Rights, such as the right to counsel, or in which the prosecutor's remarks so prejudiced a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right.") (internal citations omitted)). To permit habeas relief, a state court's evidentiary decision must have been so arbitrary or prejudicial that it rendered the trial fundamentally unfair. *See Romano v. Oklahoma*, 512 U.S. 1, 12–13 (1994); *see also Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001) (evidentiary error rises to the level of a Due Process violation only when "it was of such magnitude as to undermine the fundamental fairness of the entire trial").

The appropriateness of expert witness testimony is analyzed under this same fundamental-fairness standard that applies to other claims of evidentiary error. *See Beltran v. Hastings*, No. 12-2042, 2014 WL 1665727, at *12–17 (D.N.J. Apr. 24, 2014) (analyzing the appropriateness of expert testimony on habeas review under the standard for evidentiary error); *see also Dandor v. Ricci*, No. 09-1565, 2011 WL 735065, at *16 (D.N.J. Feb. 22, 2011) (finding on habeas review that expert testimony was not improper because the testimony did not violate

13

fundamental fairness). The United States Supreme Court has "defined the category of infractions that violate fundamental fairness very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal quotations omitted); *see Potter v. Att'y Gen. of New Jersey*, No. CV 15-8784, 2018 WL 3201799, at *13 (D.N.J. June 29, 2018) (permitting expert testimony of detective that possession of 850 bags of heroin and $1500 in cash is consistent with intent to distribute).

There is no indication that the trial court's decision (or the decisions affirming it) were so arbitrary or prejudicial that they rendered the trial fundamentally unfair. The Appellate Division issued the last reasoned decision on the matter, holding as follows:

> [Petitioner] next challenges as error Judge Ravin's admission of evidence referencing his membership and status in MS–13. Gang references were made in [Petitioner]'s custodial statement as he alternatively suggested the shootings were a test for a new gang member or designed as retribution because he, incorrectly, believed Aeriel belonged to a rival gang responsible for killing an MS–13 member. Further, the State proffered testimony from a jailhouse informant who was expected to relate [Petitioner]'s admission that the shootings were gang-related, and the testimony from an expert who would discuss MS–13 and the significance of [Petitioner]'s references. [Petitioner] asserts the prejudicial nature of this evidence far exceeded its probative value and required its exclusion under *N.J.R.E.* 403. We disagree.
>
> When considering a trial judge's evidentiary rulings, we examine whether the decision reflects an abuse of discretion. *State v. Torres,* 183 N.J. 554, 567 (2005); *State v. Brown,* 170 N.J. 138, 147 (2001). A trial judge exercises discretion when determining "[t]he necessity for, or propriety of, the admission of ... testimony, and the competence of such testimony [.]"*State v. Zola,* 112 N.J. 384, 414 (1988), *cert. denied,* 489 U.S. 1022 (1989).
>
> Here, following an evidentiary hearing, Judge Ravin considered the proffered evidence and evaluated its probative value to prove [Petitioner]'s guilt including, its relevance to elements of the crimes charged; its tendency to prove the State's theory of plan, [Petitioner]'s state of mind, or motive; whether other evidence is available to prove the same facts; and its tendency to disprove [Petitioner]'s trial strategy, suggesting he was at the scene but not involved in the shootings.
>
> Further, Judge Ravin weighed the evidence's probative value against its prejudicial nature, properly considering the four-part test delineated in *State v. Cofield,* 127 N.J. 328, 338 (1992).[3] *See State v. Carlucci,* —— N.J. ——, —— (2014) (slip op. at 14). Judge Ravin agreed the portion of [Petitioner]'s custodial statement implicating his younger half-brother, suggesting [Petitioner] accompanied Alfaro to Virginia for initiation into MS–13, along with portions of the State's proposed expert's report were found to be unduly prejudicial. However, on balance, the gang affiliation evidence was found necessary to shed light on

[Petitioner]'s "motive for purposeful or knowing murder" and found to outweigh the damaging nature of that evidence. The judge stated

> without the evidence that [Petitioner] is a gang member, the manner in which his gang operates, his status in the gang and that in that status he ordered the commission of these crimes, the State will not be able to prove his vicarious liability for the crimes committed by his co-defendants. And it is for those reasons that the [c]ourt concludes that the probative value of the evidence is not outweighed by its apparent prejudice.

To assure fairness, the State was ordered to cooperate with [Petitioner] to sanitize the proposed gang-related references, limiting them to motive and intent. Also, jointly crafted instructions regarding the use of the evidence were to be submitted. Any unresolved challenges were to be addressed in a *N.J.R.E.* 104 hearing. Finally, during jury selection, prospective jurors were asked about their knowledge of MS–13 and whether [Petitioner]'s membership in MS–13, if presented, would affect their ability to be fair and impartial.

On appeal, [Petitioner] argues the court erred by admitting the highly prejudicial gang affiliation evidence which he contends had limited probative value and "insufficient linkage existed between [Petitioner]'s alleged gang membership and the crimes charged." He suggests his custodial statement was "just a 'story' filled with 'lie after lie' that [Petitioner] gave to police to try to obtain protection for his family[.]" We disagree, relying substantially on the reasoning set forth in Judge Ravin's written opinion following the evidentiary hearing and his oral opinion, when he considered and denied [Petitioner]'s motion for a new trial. *R.* 2:11–3(e)(2).

In light of [Petitioner]'s claim he was in the schoolyard, but not with the others who committed the murders and other crimes, the judge found the gang affiliation evidence relevant and necessary to link the six men to one another. Thus, *Cofield's* first prong was satisfied. He determined the evidence, which included proofs gathered in the law enforcement investigation and found [Petitioner]'s custodial statements were convincing proof of his and co-defendants' gang membership. Finally, Judge Ravin satisfied the required prong four weighing analysis, which supports the conclusion, and we will not set it aside.

*Direct Appeal*, 2014 WL 1302366, at *7–8 (omitting footnote reproducing relevant jury charge).

The record establishes, as the state courts held and as Respondents argue, that Investigator Alicea was qualified to testify as an expert regarding MS-13 and its connection to Petitioner. Indeed, even Petitioner's trial counsel agreed "that there are things about MS-13 that the average juror would not know" and that Alicea was "at least as qualified as the expert" permitted in *State v. Torres*, another New Jersey case in which an MS-13 expert was permitted to

testify." (DE 8-4 at 8-9); 183 N.J. 554 (2005).  As Judge Ravin found, the testimony was probative as to whether "Petitioner is a gang member, the manner in which the gang operates, his status in the gang and that in that status he ordered the commission of these crimes." (DE 9-15 at 154.) Alicea then testified to those matters, including, among other distinctive characteristics, internal rules and structure including recruiting, admission to the gang ("jumping in"), identifiers ("homies"), distinctive clothing, use of machetes, and rival gangs (DE 9-21 at 99, *et seq.*). Thus, Judge Ravin's instruction to the jury regarding that evidence, which Petitioner did not object to, was not inappropriate and does not merit habeas relief.

### 2.   Ground Three: comments by the prosecutor

Petitioner next argues that the prosecutor's summation exceeded permissible fair comment. (DE 1 at 10-11.) Petitioner objected at trial, and unsuccessfully raised the issue on appeal and direct appeal. (DE 9-20 at 37; 9-17 at 2, n. 1.)

A defendant's due process rights are violated if prosecutorial misconduct renders a trial fundamentally unfair. *See Darden v. Wainwright*, 477 U.S. 168, 182–83 (1986). A habeas petitioner challenging a prosecutor's trial summation will not succeed merely because the prosecutor's actions were undesirable or even universally condemned. *See id.* at 181. Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation marks and citation omitted). A prosecutorial misconduct claim is examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). A "reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the [Petitioner]." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

Petitioner, as he did in state court, challenges numerous statements in the prosecutor's summation to the jury. The first involves statements by the prosecutor that allegedly could have caused the jury to infer that Petitioner's alleged co-perpetrator, Jose Carranza, had implicated Petitioner in the murders. The last reasoned decision on this topic was the Appellate Division's rejection of the argument, which examined the entire record and placed the prosecutor's comment in context:

For context, we again note [Petitioner] maintained he was not part of the shootings, but merely present when they occurred. Further, in closing, the defense repeated [Petitioner]'s custodial statement was all lies, stating [Petitioner] was "lying through his teeth ... through fear, loyalty or whatever," designed to protect himself from the actual perpetrators, specifically Carranza.

After recounting the evidence regarding [Petitioner]'s arrest, the prosecutor repeated [Petitioner]'s remarks: "How did you find me? Someone must have told on me," and his expressed concern for his family's safety. The prosecutor also noted co-defendant Carranza had surrendered prior to [Petitioner]'s arrest. He then stated:

> Well, if you assume the mind set of [Petitioner], he's concerned when he's arrested ... that his homies are gonna think that because he's arrested, he's gonna squeal. He's gonna snitch. Well, he knew Mr. Carranza had been arrested.... So, to his mindset ... his turnabout [w]as fair play.

[Petitioner] asserts the summation, as presented, improperly implied co-defendant Carranza had given police a statement implicating [Petitioner], so he retaliated by suggesting Carranza did the shootings. The reference to purported evidence not presented at trial is alleged to be improper.

A review of the summation as a whole makes clear the prosecutor was responding to the defense closing statements proffering an explanation for rejecting [Petitioner]'s custodial statement. Judge Ravin determined the State's comments were "wholly appropriate" and denied the motion for a mistrial. In response to the defense request for a curative instruction, the State did not object and Judge Ravin told the jury, "there is no evidence that co-defendant, Jose Carranza, gave a statement implicating the [Petitioner] or anyone else, and you are not to speculate about that subject." When he resumed closing, the prosecutor clarified his "comments" explaining he was suggesting only this was "[[Petitioner]s] mind set only; his mind set."

We agree with Judge Ravin that the prosecutor's comments were responsive to defense counsel's summation comments, which included assertions [Petitioner] avoided the police and was hiding in Maryland because he believed he and his family would be in danger if apprehended, because in his circle, it was believed a person, once arrested, would snitch. *State v. McGuire,* 419 N.J. Super. 88, 145 (App. Div.) ("A prosecutor's otherwise prejudicial arguments may be deemed harmless if made in response to defense arguments."), *certif. denied,* 208 N.J. 335 (2011). Moreover, the curative instruction and judge's clarifying comments assure the remark possibly inferring Carranza would not be misconstrued to implicate [Petitioner] or cause prejudice because the State explained it as a theory. *State v. Burns,* 192 N.J. 312, 334–35 (2007).

*Direct Appeal*, 2014 WL 1302366, at *9–10.

Petitioner next takes issue with the prosecutor's inference that Petitioner had made calls to his co-perpetrators, but police were unable to obtain a communications data warrant for Petitioner's phone because he had destroyed it. Again, the Appellate Division rejected that argument and noted Judge Ravin's prompt curative instruction:

> [Petitioner] also challenges the prosecutor's statement that police unsuccessfully attempted to obtain a communications data warrant to identify calls to co-defendants, but [Petitioner] had destroyed his phone, thus, suggesting [Petitioner] was impeding the police efforts. [Petitioner] objected and the State did not oppose the issue being addressed in a curative instruction. The judge explained to the jury:
>
>> [T]here was a reference in [the prosecutor's] summation that the police could not obtain a[c]ommunications [d]ata [w]arrant because [Petitioner] had destroyed his cellphone. As a matter of fact, a CDW could have been obtained to get the record of incoming and outgoing calls from the cellphone but the cellphone, itself, would not be able to be located. Therefore, you should disregard that aspect of [the prosecutor's] argument.
>
> Judge Ravin's comment negates any perceived prejudice. His decision to interrupt the prosecutor's summation to issue a curative instruction, which both parties accepted as effective, fell "within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting." *State v. Winter,* 96 *N.J.* 640, 647 (1984).

*Direct Appeal*, 2014 WL 1302366, at *10.

The final statement Petitioner challenges was the prosecutor's characterization of the murders as an "ad hoc street level MS–13 type of mindless attack." Again, the Appellate Division approved of Judge Ravin's handling of Petitioner's objection:

> The challenged comment was as follows:
>
>> [Petitioner] had the opportunity, with the other person, to see the soft target in an isolated area when nobody else was around. Is it a[m]aster [p]lan concocted by some evil organization at a high level? No. It's an ad hoc street level MS–13 type of mindless attack.... [W]e gotta call, we got to see if [Carranza]'s got heart. Hey, come on over. They was in the wrong place at the wrong time, with the wrong man to observe them.
>>
>> [N.A.] tells you there wasn't a long meeting; quick talk, under a minute. How'd the weapons all of a sudden show up? Just carry a machete down the street? Weapons that, you think, valuable enough to hide in other jurisdictions? You just bop around with them looking for trouble with the

> police? Nah. They was playing, ladies and gentlemen. May not be as sophisticated as we conjure up when we think conspiracy, but there was.

Defense counsel objected and moved for a mistrial, or in the alternative, that the comment be stricken and the jury be instructed it was improper. The judge reserved his determination. Then, shortly thereafter, when the State's summation concluded, Judge Ravin immediately stated: "Ladies and gentlemen, a point of reference; [the prosecutor's] characterization of an MS–13 kind of mindless attack, I'm instructing you to disregard that. I have given you and will repeat, an instruction concerning the permitted and prohibited use of the MS–13 gang evidence." The jury charge also included the following:

> There has been evidence in the case concerning MS–13 and [Petitioner]'s alleged membership in that gang. It will be up to you to determine if this evidence is credible or not. If you do find it credible, it will be up to you to determine if it has any relevance to a possible motive for the charges set forth in the indictment, or any other issues you may have to decide. I instruct you, however, that you can never use the evidence that [Petitioner] may be a member of MS–13 to conclude that [Petitioner] has a predisposition to commit any crimes. As well, you can never use the evidence that [Petitioner] may be a member of MS–13 to conclude that [Petitioner] must be guilty of the crimes alleged in the indictment.

We have no doubt the jury fully followed these instructions. *Burns, supra,* 192 N.J. at 335. We conclude not only was the prompt and strong curative instruction effective, but also, when coupled with the instruction in the final charge, together they eliminated any possible prejudice caused by the comment. [Petitioner] is entitled to a fair trial, not a perfect one. *State v. R.B.,* 183 *N.J.* 308, 333–34 (2005).

*Direct Appeal*, 2014 WL 1302366, at *10–11.

Upon examination of the record, I am unable to discern any unreasonable application of the law or interpretation of the facts in the state court decisions, beginning with Judge Ravin's handling of the objections as they occurred and up to the Appellate Division's discussion of those issues, which is persuasive. Placed into their proper context, I find that the bulk of the prosecutor's comments were made in response to the Petitioner's own arguments, and that they did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. *See Darden*, 477 U.S. at 181. More importantly, at every critical juncture, Judge Ravin's curative instructions were clear and accurate, and "[a] jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); (DE 9-9 at 139-40.)

Finally, to the extent that Petitioner's reply simply restates his earlier arguments or cites generally to the law governing summations, I find it unpersuasive. Accordingly, Petitioner is not entitled to habeas relief on this ground.

### 3.  Ground Four: comments by the prosecutor

Petitioner next argues that the trial court violated his Sixth Amendment right to confront witnesses. He focuses specifically on State witness Will Jordan, who alleged that Petitioner had told him that he was "sorry for giving the order to cause the death of them kids," about Jordan's criminal history. (DE 1 at 12; DE 7 at 78-85.) Petitioner asserts that he was not permitted to fully and effectively impeach Jordan with his criminal history, a claim he raised before the Appellate Division and New Jersey Supreme Court on direct appeal. (DE 9-20 at 37; 9-17 at 2, n. 1.)

New Jersey, like most jurisdictions, limits the use of extrinsic evidence to impeach a witness's general credibility. N.J.R.E. 608. N.J.R.E. 609 allows for the introduction of prior criminal convictions unless precluded by the trial court "as remote or for other causes." Those restrictions do not apply, however, when attacking a witness's credibility based on alleged motive or bias. *State v. Garfole,* 76 N.J. 445 (1978); N.J.R.E. 404(b).

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." "The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, means more than being allowed to confront the witness physically." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). Indeed, "[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*'" *Davis v. Alaska,* 415 U.S. 308, 315-16. Trial courts must allow defense counsel latitude in cross-examining a witness's bias or motive. *Davis v. Alaska, Id.* at 316. Impeachment with prior crimes is precisely the "otherwise appropriate" cross-examination permitted under *Van Arsdall,* 475 U.S. at 680. It is a prototypical form of cross-examination, even if it goes only to the witness's credibility. *See Davis,* 415 U.S. at 316. In the habeas context, the failure to recognize that exclusion of impeachment evidence amounts to a Confrontation Clause violation represents an unreasonable application of Supreme Court precedent, most notably *Davis. Vasquez v. Jones*, 496 F.3d 564, 571 (6th Cir. 2007).

However, the Confrontation Clause does not preclude *all* limits on cross examination. *See Van Arsdall,* 475 U.S. at 679. Indeed, the "Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to

whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985) (emphasis in original). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall,* 475 U.S. at 679.

The Confrontation Clause guarantees the right to confront a witness with his prior conviction "only as necessary to probe [the witness] for bias and prejudice and not generally to call [the witness's] good character into question." *Davis,* 415 U.S. at 311. For example, in *Davis,* the "crucial witness" was still on probation at the time of the trial. *Id.* The Court noted that petitioner's counsel sought to "to show specifically that at the same time [the witness] was assisting the police in identifying petitioner he was on probation for burglary." *Id.*

The Third Circuit has consistently recognized that a trial court may limit cross-examination in certain circumstances. For instance, cross-examination can be restricted when it is repetitive, confusing, or irrelevant. *United States v. Tykarsky,* 446 F.3d 458, 475 (3d Cir. 2006). Moreover, most federal courts have held that *Davis* and *Van Arsdall* do not recognize an unrestricted right to introduce the convictions of witnesses. *See United States v. Williams,* 963 F.2d 1337, 1340 (10th Cir. 1992) (holding that defendants' Sixth Amendment rights were not violated because there was no evidence that the witnesses were on probation and therefore subject to government influence); *United States v. Cameron,* 814 F.2d 403, 406 (7th Cir. 1987) (holding that the district court did not deprive the appellant of his right to confrontation because "nothing in the excluded evidence suggest[ed] that [the witness] had any motive to lie or any bias against the defendant"); *Reiger,* 789 F.2d at 1433 (holding that the state court properly precluded the petitioner from cross-examining a state's witness about her prior conviction for shoplifting since it "[did] not suggest any bias against Reiger"); *Mills v. Estelle,* 552 F.2d 119, 122 (5th Cir.1977) (distinguishing between using a witness's prior convictions to attack a witness's bias or motive and attacks on general credibility).

The Appellate Division rejected Petitioner's argument, holding—as Respondents argue here—that "Jordan's cross-examination was thorough and afforded defendant ample opportunity to highlight his bias and challenge his credibility":

> [Petitioner] attempted to inquire of "details" regarding Jordan's "prior crimes,
> length of incarcerations, and length of jail stints, arguing that the defense has wide
> latitude to cross-examine such a cooperating witness." The State objected when

Jordan was asked whether he had been paroled after his first offense as a teenager. Judge Ravin sustained the objection as the inquiries' "relevance [wa]s outweighed by considerations of confusion of issues." Next, [Petitioner] questioned Jordan regarding his second criminal conviction, asking about the time that elapsed between his first release and when he committed his second offense. The State's objection was sustained for the same reason. [Petitioner] resumed questioning, this time asking directly whether the plea agreement Jordan negotiated on pending charges included a recommendation for parole when first eligible and whether he understood the parole system. Next, the defense asked Jordan whether given his prior record, he would have difficulty getting paroled, without a plea agreement. Judge Ravin overruled the State's objection, as well as the inquiry of whether Jordan was familiar with how to plea bargain.

As the defense continued its probe of Jordan's past convictions, the judge sustained the State's objection to questions seeking to elicit specific details regarding the actual offense. Similarly, questions regarding the details of the charges to which the recent plea agreement applied were disallowed. Jordan did discuss the offenses, the significant jail time he faced, the terms of the plea deal, which included the State downgrading and dismissing of certain charges, and his agreement to testify against his co-defendants.

Also, during cross-examination, Jordan conceded he sought something in exchange for testifying about his conversations with [Petitioner]. Although he acknowledged he received no promises, he confirmed the offered plea deal included the minimum possible sentence.

We have considered the entirety of Jordan's cross-examination and reject as unfounded [Petitioner]'s claimed denial of his constitutional right of confrontation. Jordan's cross-examination was extensive and the areas of inquiry, which were limited, were properly disallowed.

\*\*\*

*Direct Appeal*, 2014 WL 1302366, at \*11–13.

The record is clear that Judge Ravin afforded defense counsel considerable latitude to probe (and therefore highlight for the jury) Jordan's alleged motive to lie in exchange for leniency and general credibility issues. As Judge Ravin indicated on the record, questioning a cooperating witness regarding the "expectation of favorable treatment" was a permissible line of questioning that was explored here. (*Id.* at 184.)

For example, counsel asked about Jordan's numerous aliases (DE 9-6 at 167), that Jordan—about 40 at the time he testified—had a criminal record including at least five convictions dating back to age 16 or 17, which included burglary, robbery, and possession of a

fake insurance card (*id.* at 173, 180, 187-88); that he served multiple prison terms, that Jordan had a "pretty good understanding of how the parole system works" (*id.* at 179-82); that "one of the things…worked out by [Jordan's] attorney was a promise that the State would go to bat for [Jordan] when [he] came up for parole" to avoid extra prison time (*id.* at 183); that one of his convictions was for leaving the scene of a fatal accident in New York (*id.* at 183, 185-86); that Jordan faced "significant time" for five drug-related racketeering counts when he made the deal to dismiss or downgrade some charges in exchange for his cooperation (*id.* at 191-94); that Petitioner was afforded certain privileges in detention that Jordan was not (*id.* at 201-02); that Jordan "wanted something out of" his cooperation with authorities (*id.* at 219); and that he actually received a sentence reduction as part of a plea bargain (*id.* at 222-23).

In other words, the record shows that Judge Ravin did not significantly restrict trial counsel's examination. But even if that had occurred, it is equally clear that the jury heard, but afforded limited weight to, any evidence of Jordan's bias or motive to lie. Accordingly, Petitioner is not entitled to habeas relief on this ground.

### 4. Ground Five: media exposure

Petitioner next argues that significant media exposure and publicity impacted the fairness of the trial and impartiality of the jurors. (DE 1 at 17.) Petitioner contends that the trial court erred by denying defendant's related motions to change venue, remove jurors, and for a mistrial and new trial. (*Id.*) Petitioner raised this claim unsuccessfully before the Appellate Division and New Jersey Supreme Court. (DE 9-20 at 37; 9-17 at 2, n. 1.)

Due process does not require that jurors be completely unaware of trial publicity, but they must be able to judge a defendant impartially. "Where media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the defendant without reference to an examination of the attitudes of those who served as the defendant's jurors." *Riley v. Taylor*, 277 F.3d 261, 299 (3d Cir. 2001). "The community and media reaction, however, must have been so hostile and so pervasive as to make it apparent that even the most careful voir dire process would be unable to assure an impartial jury…. Such cases are exceedingly rare." *Id.*

To determine whether trial publicity has prejudiced the jury, courts must: (1) determine whether the news coverage is prejudicial; (2) if so, determine whether any jurors were exposed to

the coverage; and (3) if exposure did occur, the court examines the exposed jurors to determine if this exposure compromised their impartiality. *Barry v. Bergen Cnty. Prob. Dep't*, 128 F.3d 152, 163 (3d Cir. 1997).

As defense counsel argued frequently during the trial, there was indeed news coverage that focused on Petitioner. But even so, the trial court and Appellate Division found nothing to suggest that any such coverage influenced the jury. The Appellate Division discussed in detail the trial court's proper steps to eliminate any such prejudice through the voir dire process, and the defendant's evident satisfaction with the jury as impaneled:

> Beginning with jury selection, the select transcripts contained in the record show some jurors admitted they knew about the crimes or had some knowledge of MS–13. Of the twenty-one prospective jurors with prior knowledge of the case, six were seated as jurors after extensive voir dire and express finding the jurors could decide the case impartially based only upon the evidence presented in the courtroom. Important to our determination [Petitioner] suffered no prejudice is the fact he had not exhausted his preemptory challenges, having used only eighteen of the twenty allotted. See *State v. Fortin*, 178 N.J. 540, 629 (2004) ("[A] defendant may be entitled to a new trial if he has been forced to use one of his allotted peremptory challenges in order to excuse a juror who should have been excused for cause."). Moreover, [Petitioner] does not identify a sitting juror who should have been disqualified; rather, he only advances general assertions that any juror with prior knowledge should have been struck for cause.
>
> The conduct of voir dire, which undoubtably is integral in safeguarding a defendant's right to a fair trial, *State v. Papasavvas*, 163 N.J. 565, 584 (2000), is left to the broad discretion of the trial court. *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991); *Fortin, supra*, 178 N.J. at 629. A trial judge's exercise of reasoned discretion, generally, will not be disturbed on appeal. Ibid. Further, the judge's finding that a prospective juror is impartial will not be second-guessed by this court, absent a showing of clear error. *State v. Williams*, 113 N.J. 393, 410 (1988). Disqualification for cause is appropriate only upon a demonstration that a potential juror cannot set aside preexisting impressions and decide the case based solely upon the evidence presented in court. *State v. Williams*, 93 N.J. 39, 61 (1983).
>
> Indeed, defendant could have used his peremptory challenges to strike any juror he believed was biased from prior exposure to this matter, but he did not. Further, he does not demonstrate any sitting juror, who had some degree of prior knowledge of the case, improperly "formed an unalterable opinion as to the defendant's guilt or innocence" requiring him or her to be excused. *State v. Loftin*, 191 N.J. 172, 187 (2007). Accordingly, this claim is unfounded.

The Appellate Division agreed, and Respondents do not dispute, that the prospective jury pool (and eventual jury members) were exposed to news accounts of the case and allegations of MS-13 involvement. (DE 7 at 89.) As Respondents argue, however, there is no demonstration that Petitioner was prejudiced in the presentation of his defense that, although present at the scene, he had no connection to MS-13 or the crimes. (*Id.*)

The Appellate Division noted the trial judge's careful handling of the issue and the steps he took to ensure that there was no prejudice from pretrial publicity and no exposure to coverage of the trial itself:

> In a related argument, on an almost daily basis, defendant moved for a mistrial or, alternatively, a change of venue based upon ongoing prejudicial newspaper reports on the case. The court denied each motion, finding no juror had read the cited articles. As required, on one occasion the judge interrupted the trial to poll the jury regarding possible media exposure. Having done so, Judge Ravin concluded there was no evidence of exposure to the identified articles.[3] *See State v. Tindell*, 417 N.J. Super. 530, 564 (App. Div. 2011) (holding a trial judge concluding mid-trial publicity will prejudice a defendant must determine whether a realistic possibility of juror exposure occurred and if so, "voir dire the jurors to determine whether any exposure has occurred") (citations omitted). In an additional effort to protect defendant's rights, the judge repeatedly issued instructions for all jurors to avoid media accounts.
>
> A motion for a change in venue "shall be granted if the court finds that a fair and impartial trial cannot otherwise be had." *R.* 3:14–2. We review decisions denying a request for a change of venue for an abuse of discretion. *State v. Biegenwald*, 106 N.J. 13, 35–36 (1987).
>
> Here, our review of this record demonstrates that despite the publicity that occurred during trial, there is no evidence the sitting jurors were influenced by the publications. Also, much of the publicity surrounding the crimes had occurred years earlier and the judge took steps to assure anyone who may have read these accounts could perform the impartial role required of a juror. See *State v. Koedatich*, 112 N.J. 225, 273 (1988) (noting media exposure was muted because nearly two years had passed between intense publicity of the crimes and jury selection). Once the trial commenced, the judge repeatedly acted to safeguard the jury process. He instructed jurors not to review any media accounts and when necessary polled the jury to assure compliance. Defendant's suggestion of juror taint by media exposure are nothing more than unsupported speculation.

---

[3] Footnote 5 of the Appellate Division's opinion: "The appellate record does not include the marked newspaper articles, defense counsel's request that the jury be polled, or the transcript from the polling of the jury on this issue. Nevertheless, these facts are not disputed."

> Accordingly, Judge Ravin did not abuse his discretion or erroneously deny
> defendant's motions for a mistrial or new trial.

*Direct Appeal*, 2014 WL 1302366, at *13–14.

Judge Ravin's extensive voir dire determined that the six jurors with prior knowledge of the case could decide the case impartially based upon only the evidence presented in the courtroom. This was coupled with frequent and emphatic orders to the jury to avoid all media accounts (or anyone who might relay them to the jurors), and a complete lack of evidence in the record that any juror disobeyed those orders. (*See, e.g.* DE 9-8 at 48-49 ("You are to avoid all media accounts of this trial scrupulously with single-mindedness and if you suspect that anyone you know would discuss any media accounts of this trial with you based on what they saw or heard? You have to avoid them too. … I couldn't be more serious. You are to avoid anyone connected with this case and they are to avoid you, as well."); DE 9-9 at 149 ("…you are to avoid anyone whom you would have the merest whiff of suspicion would even dare to discuss media accounts of this trial in your presence."))

As Judge Ravin found at trial in response to defense counsel's arguments regarding a particularly inflammatory newspaper article, there is an "utter absence of proof that the people that matter the most, … the jury, were exposed" to that article or any other. (*Id.* at 6-8.) That remains the case today, as Petitioner still presents no evidence (or even any specific allegation) that any seated juror was exposed to, or influenced by, any inflammatory media coverage. Accordingly, this ground does not entitle Petitioner to habeas relief.

### 5.   Ground Six: denial of motion for a new trial based on insufficient evidence of guilt

Petitioner next argues that the state's evidence was insufficient to prove his guilt, and therefore that the trial judge erred in denying Petitioner's motion for a new trial on that basis. Petitioner raised this claim on direct appeal; in response, the Appellate Division held that "the verdict overwhelmingly supported defendant's guilt beyond a reasonable doubt. *Direct Appeal*, 2014 WL 1302366, at *14. Petitioner makes four arguments: (1) that no physical evidence linked him to the murder weapons; (2) that bullet fragments were not turned over to ballistic experts until years after the crime and weeks before trial; (3) that an eyewitness's testimony was inconsistent; and (4) that the lone surviving victim did not directly implicate Petitioner.

26

Petitioner is generally correct that neither knowledge of a conspiracy nor mere presence at the scene is sufficient to support a conviction of conspiracy or commission of a crime. *United States v. Tyson*, 653 F.3d 192, 210 (3d Cir. 2011) (holding defendant's mere presence at scene is insufficient evidence of membership in conspiracy); *Eley v. Erickson*, 712 F.3d 837, 848 (3d Cir. 2013) ("[E]vidence of a defendant's association with the perpetrator of the crime, presence at the scene of the crime, or knowledge of the crime cannot establish an unlawful agreement." (citing *Commonwealth v. Murphy*, 577 Pa. 275, 844 A.2d 1228, 1238 (2004)). However, "direct or indirect participation in the commission of the criminal act where there is the shared purpose to achieve the criminal objective renders one guilty of the criminal act." *State v. Kamienski*, 254 N.J. Super. 75, 96 (App. Div. 1992) (citations omitted).

In its opinion denying Petitioner's PCR appeal, the Appellate Division summarized the evidence against Petitioner, which well exceeded "mere presence":

> The ensuing investigation revealed evidence that defendant was a senior member of a gang and that, at his direction, he and five co-defendants committed the robberies, assaults, murders, and attempted murder. That evidence included DNA from beer bottles and cigarette butts linking defendant to the scene of the crimes, a statement from defendant during which he admitted his involvement with the robberies and murders, and a statement from a county jail inmate to whom defendant admitted that he ordered the murders.

*PCR Appeal*, No. A-3972-15T1, 2018 WL 333490, at *1.

In his original oral decision denying Petitioner's motion for a new trial, Judge Ravin also highlighted "the testimony of [N.A.], evidence of her grievous injuries," as well as N.A.'s testimony that "the four victims were robbed at gunpoint, shot, and that those responsible met together and acted in concert." (DE 9-12 at 20-22.) Judge Ravin also rejected defense counsel's argument that the jury's prompt (four-hour) guilty verdict evidenced a lack of consideration., finding it just as likely that they found the evidence of guilt "overwhelming." (*Id.* at 11.)

Petitioner's arguments, which he again essentially recycles from the state proceedings, rely upon purported inconsistencies at trial. Some—like his arguments regarding N.A.'s and the other surviving eyewitness's testimony—fly in the fac of Petitioner's own admission to his presence at the scene. Likewise, even accepting Petitioner's argument that the bullet fragments from the victims were not given to ballistic experts until years after the crime, the significance if any to the jury's verdict is unexplained. Petitioner asks, in other words, that I accept the version of events that the jury rejected: that Petitioner was simply a bystander at the scene and did not

participate. There was an ample basis for the jury to find as it did, and I find no sufficient basis to substitute the judgment of the court.

In his reply, Petitioner's cites new evidence of innocence. In an affidavit, his co-defendant Mr. Jovel purports to take sole responsibility for the murders and related crimes. This argument was rejected by every court to address it, and I discern no basis to disturb those conclusions, for reasons I will set forth below. (*See* p. 38, Part IV.D, *infra*.) Accordingly, this ground does not provide any basis for habeas relief.

### C.  Ineffective Assistance of Counsel (IAC)

Petitioner's IAC claims are chiefly directed to the performance of trial counsel, but also to appellate counsel. All are governed by the same two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984); *accord Lewis v. Johnson*, 359 F.3d 646, 656 (3d Cir. 2004) (*Strickland* test applies to the performance of both trial and appellate counsel). Under *Strickland*, a habeas petitioner first "must show that counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). With respect to evaluating whether counsel's performance was deficient under *Strickland*, the "proper standard ... is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential [and] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Pursuant to *Strickland*, a habeas petitioner must also demonstrate that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial ... whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299. In other words, a petitioner must additionally demonstrate that counsel's deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 692-93. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Instead, a

28

petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Shedrick*, 493 F.3d at 299.

In addition, "[w]hen a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, '[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable,' which 'is different from asking whether defense counsel's performance fell below *Strickland*'s standard.'" *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington*, 562 U.S. at 101). "Federal habeas review of ineffective assistance of counsel claims is thus 'doubly deferential.'" *Id.* (quoting *Cullen*, 563 U.S. at 190).

"And while judges may be tempted to second guess defense counsel's decisions, we must keep in mind that 'advocacy is an art and not a science, and ... strategic choices must be respected in these circumstances if they are based on professional judgment.'" *Gaines v. Superintendent Benner Twp. SCI*, 33 F.4th 705, 712 (3d Cir. 2022) (quoting *Strickland*, 466 U.S. at 681). In other words, "counsel's strategic choices will not be second-guessed by *post-hoc* determinations that a different trial strategy would have fared better." *Rolan v. Vaughn*, 445 F.3d 671, 681–82 (3d Cir. 2006).

## 1. Ground Seven: Failure to seek removal of jury foreman

Petitioner's first IAC claim is that trial counsel should have sought removal of the jury foreperson. (DE 1 at 18.) According to Petitioner, Juror 6's statement, within the first fifteen minutes of deliberation, that the foreperson "has the wrong idea and he's already making judgments and he wants to go through the list and just mark it off guilty" evidences a lack of fairness and impartiality. (*Id.*)

"The Due Process Clause of the Fourteenth Amendment guarantees state criminal defendants the right to a trial by an impartial finder of fact." *Barry v. Bergen Cnty. Prob. Dep't*, 128 F.3d 152. 163 (3d Cir. 1997) (citing *Morgan v. Illinois*, 504 U.S. 719. 726 (1992) and *Irvin v. Dowd*, 366 U.S. 717, 721–22 (1961)). Defendants have the right to be tried by a jury that is free from outside influence. *Sheppard v. Maxwell*, 384 U.S. 333, 362–363 (1966) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences.").

Trial counsel testified at the PCR hearing that he interpreted Juror 6's comments to be "outside the deliberative process" and did not think additional questioning to be necessary. Judge Ravin and the Appellate Division both ultimately rejected Petitioner's argument. In a detailed written decision, Judge Ravin found that there was no basis to question the foreperson because there was no indication of a tainted jury sufficient to warrant such questioning. (DE 9-23 at 24.) The Appellate Division summarily affirmed Judge Ravin's reasoning on that issue. *PCR Appeal*, 2018 WL 333490, at *3.

Petitioner does not provide any legal or factual basis to conclude that the *Strickland* standards were unreasonably applied. Juror 6's comments about the foreperson, at best, suggest that the foreperson had decided to convict Petitioner after a lengthy trial had concluded—in other words, after hearing the evidence. But even premature deliberation *before* the close of evidence does not deprive an individual of a fair trial before an impartial jury if it appears that the decision was based only on evidence formally presented at trial. *Szuchon v. Lehman*, 273 F.3d 299, 313 (3d Cir. 2001) (Although allegations of premature deliberation and decision to find petitioner guilty of murder by the third day of the prosecution's case were "troubling," there was no due process violation because of extensive evidence of guilt and because verdict was based only on consideration of formal evidence). It is worth noting that the other jurors did not take long to concur with the foreperson's conclusion.

There is therefore no basis to conclude that the state courts unreasonably applied federal law. There is likewise no basis to conclude that trial counsel was ineffective, or that the proceedings would have had a different outcome but for counsel's decision not to question the jury foreperson. Accordingly, this ground does not justify habeas relief.

### 2. Ground Eight: Failing to question the juror who said "we are not going to vote on the issues."

Petitioner next argues that trial counsel was ineffective for failing to further explore another jury note reading, "There is a young lady that says we are not going to vote on the issues." (DE 1 at 19.) After receiving the note and conferring with counsel, jurors were not questioned or instructed further, but the judge instructed them to continue their deliberations, which they evidently did. Respondents argue, and Petitioner does not dispute, that he did not exhaust this issue in the state courts.

Under AEDPA, this Court may not grant a writ of habeas corpus under 28 U.S.C. § 2254 unless the petitioner has exhausted state post-conviction remedies or exhaustion is excused under 28 U.S.C. § 2254(b)(1)(B). *See Henderson v. Frank*, 155 F.3d 159, 164 (3d Cir. 1998); *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997); *Toulson v. Beyer*, 987 F.2d 984 (3d Cir. 1993). Petitioners "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). "The burden is on the habeas petitioner to prove exhaustion." *DeFoy v. McCullough*, 393 F.3d 439, 442 (3d Cir. 2005). The exhaustion doctrine mandates that the claim "must have been 'fairly presented' to the state courts." *Bronshtein v. Horn*, 404 F.3d 700, 725 (3d Cir. 2005) (*quoting Picard v. Connor*, 404 U.S. 270, 275 (1971)).

"Fair presentation means that a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." Rainey v. Varner, 603 F.3d 189, 198 (3d Cir. 2010) (citations and internal quotation marks omitted). In sum, the exhaustion doctrine requires the petitioner to afford the state courts "the opportunity to resolve the federal constitutional issues before he goes to the federal court for habeas relief." *Id.* (quoting *Zicarelli v. Gray*, 543 F.2d 466, 472 (3d Cir. 1976)). The exhaustion doctrine thus requires a petitioner challenging a New Jersey conviction under § 2254 to have fairly presented each federal ground that is raised in the petition to all three levels of the New Jersey courts, that is, the Law Division, the Appellate Division, and the New Jersey Supreme Court. *See O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Rose v. Lundy*, 455 U.S. 509 (1982).

Here, though Petitioner claims that he "fully exhausted this claim to the highest court in the State," (DE 1 at 19), it does not appear that he raised it before the Appellate Division or the state Supreme Court. Accordingly, this argument cannot provide a basis for relief.

Even if I did consider it, however, I would find no basis to disturb Judge Ravin's finding that there was no basis to question any juror about the note in the first place, or Judge Ravin's subsequent finding that defense counsel was not ineffective for failing to pursue such questioning. At best, the note (like the earlier one) denotes disagreement during deliberations that the jurors ultimately resolved. Judge Ravin's decision was not an unreasonable or even incorrect application of law. Accordingly, this ground also fails to provide any basis to grant habeas relief.

### 3.   Ground Nine: Recusal

Petitioner next argues that trial counsel was ineffective because he did not seek Judge Ravin's recusal. Petitioner believes that Judge Ravin should have recused because he adjudicated a prior matter in which Petitioner jumped bail. (DE 1 at 20.) According to Petitioner, after he was caught, Judge Ravin remarked during his arraignment, "Well Mr. Godinez, I got you now you will not get away from me now." (*Id.*) Again, though Petitioner initially claims that he exhausted this claim at every state court level, he does not respond in his reply to Respondents' contention that this argument was not raised before the Appellate Division or Supreme Court. (DE 19-9 at 28.) On that basis, I would find this argument to be procedurally defaulted.

Were I to consider this argument, however, I would reject it on the merits.

I must note, at least in passing, the inherent implausibility of this allegation regarding Judge Ravin's alleged comment at the bail-jumping arraignment, raised years after the fact. The comment does not appear anywhere in the record of this on-the-record proceeding. Defendant did not refer to it in his original motion to recuse. But I need not judge the argument's plausibility to reject it. Recusal is required when, objectively speaking, "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Rippo v. Baker*, 137 S. Ct. 905, 907 (2017) *(*citing *Williams v. Pennsylvania,* 136 S.Ct. 1899, 1905 (2016) ("The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias."))

So even accepting *arguendo* that Judge Ravin made that statement, it would not evidence the necessary showing of bias. It indicates, at most, the judge's statement (in terms more colorful than necessary, perhaps) of the obvious: that Petitioner had violated the Court's bail order by absconding, had been caught, and would not be released on similar conditions again. At any rate, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings," constitute a basis for a bias or partiality motion only if "they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States,* 510 U.S. 540, 555. Nothing in the record suggests that Judge Ravin's limited interactions with Petitioner in 2004 had any impact upon his ability to fairly preside over Petitioner's trial in 2010.

Accordingly, there would have been no basis for trial counsel to raise this argument, or any indication that it would have been successful. Thus, this ground also fails to provide any basis for habeas relief.

### 4.   Ground Ten: Captain Glenn's testimony about the location of the machete

Petitioner next argues that trial counsel was ineffective for failing to challenge inconsistencies between the statements of co-defendant Jose Carranza and Captain Derek Glenn. (DE 1 at 20-21.) According to Petitioner, Carranza told police that the machete used in the attack was thrown over a gate in the area of the playground where the attack occurred, while Glenn testified at trial that he was attending a memorial service at the same school when two individuals showed him the nearby location of the machete. (*Id.*). Petitioner raised this claim in his PCR brief, but again does not dispute that it was not raised on the PCR appeal. (DE 9-19 at 23.) Accordingly, this claim is also procedurally defaulted.

Again, even if I were to consider this argument, I would nevertheless find it unpersuasive. Judge Ravin analyzed this argument, discussing Petitioner's theory that the state "made a deal with Carranza to lead the state to the machete in exchange for the state not pursuing a charge related to the gun or machete, as Carranza was the only one not charged with this crime." (DE 9-23 at 34-35.) Judge Ravin found that trial counsel's choice not to question Captain Glenn about the machete was "within the range of competence demanded of attorneys in criminal cases" and that "Petitioner failed to show that he was actually prejudiced." (*Id.* at 35.)

I see no basis to disturb this finding, because Petitioner fails to overcome the presumption that trial counsel's decision not to question Glenn about the inconsistency was anything other than trial strategy. *See e.g., Dingle v. Sec'y, Dep't of Corr.,* 480 F.3d 1092, 1099 (11th Cir.2007) ("Even if counsel's decision ... appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'"). And even if counsel had pursued that questioning, it is not evident what effect the questioning would have had except to remind the jury that a victim's DNA was found on the machete. Accordingly, this ground also fails to provide a basis for habeas relief.

### 5.   Ground Eleven: N.A.'s inconsistent statements

Petitioner next argues that trial counsel was ineffective for failing to highlight discrepancies in the testimony of one of the victims, N.A. Judge Ravin rejected these claims in his decision rejecting Petitioner's PCR, and Petitioner again does not dispute that he did not appeal this issue. Accordingly, this claim is also procedurally barred.

Even if it were not, however, I would find no basis to disturb Judge Ravin's conclusion that a challenge based on inconsistencies between N.A.'s grand jury testimony and trial testimony would not have affected the trial's outcome. Judge Ravin recounted the subjects of the alleged inconsistencies: where the attackers entered the park, which person ordered N.A. to get on the ground, whether she recalled being robbed, and another victim's whereabouts. (DE 9-23 at 35-36.)

"As a general rule, courts defer cross-examination strategies to the sound professional discretion of trial counsel." *Moore v. Beard*, 42 F. Supp. 3d 624, 638 (M.D. Pa. 2014); *see also Nguyen v. Grace*, 245 F. App'x 130, 131–32 (3d Cir. 2007); *Curry v. United States*, No. 11-5800, 2015 WL 733274, at *15 (D.N.J. Feb. 20, 2015) ("Decisions regarding cross examination, including the extent and manner, are generally considered strategic in nature and will not support an ineffective assistance of counsel claim." (quoting *United States v. Bellinger*, No. 09-4555, 2010 WL 3364335, at *5 (E.D. Pa. Aug. 24, 2010)). Under certain circumstances, however, the failure of counsel to impeach or cross-examine a witness at trial may constitute ineffective assistance of counsel in violation of the Sixth Amendment. *United States v. Travillion*, 759 F.3d 281, 291–92 (3d Cir. 2014); *Berryman v. Morton*, 100 F.3d 1089, 1102 (3d Cir. 1996) (failure to further investigate and challenge eyewitness's testimony prejudiced petitioner because the petitioner's guilt "rested entirely on the accuracy of" the eyewitness's identification).

To determine whether Petitioner was prejudiced by ineffective assistance, courts examine, in light of the totality of the evidence presented at trial, whether there is a reasonable probability that cross-examination would have changed the trial's outcome. *See Moore*, 42 F. Supp. 3d at 641. Here, Petitioner does not explain how the inconsistencies would have changed the outcome other than to generally challenge N.A.'s reliability as a witness. But as the state courts indicated, Petitioner's presence at the scene was never at issue; he argued, not that the injury to N.A. did not occur, but that he was not the perpetrator. Thus, it was not—or at least not principally—N.A.'s testimony that implicated Petitioner, whose defense was that he was at the scene but not a participant in the crime.

34

In addition, N.A. was an innocent and presumably sympathetic victim. To attack her testimony aggressively could have backfired badly. The decision not to do so falls well within the range of reasonable trial strategy. *See Vogt v. Fisher*, No. 20-CV-03130, 2022 WL 1620675, at *31 (N.D. Cal. May 23, 2022) ("…counsel may have made a tactical decision not to cross-examine [the witness] about these statements after determining that she was a sympathetic witness such that it would not have been a wise trial strategy to attack her testimony with statements she made to the police while she was still in a state of shock from learning about the allegations.") (internal quotations omitted). Accordingly, this ground does not provide a basis for habeas relief.

### 6.  Ground Twelve: Trial publicity

Next, Petitioner repackages his contentions regarding media publicity as a claim that trial counsel was ineffective for failing to adequately investigate the impact of publicity upon the jury. This argument is rejected for the reasons discussed above: trial counsel did, in fact, make numerous motions and arguments challenging the impact of publicity upon the jury. Judge Ravin rejected these arguments—correctly, as discussed above—and Petitioner does not explain how trial counsel could have further pursued this argument, why it would have succeeded, or what additional information would have been uncovered.  Accordingly, this ground also fails to demonstrate a basis for habeas relief.

### 7.  Ground Thirteen: Tailored jury charge/adverse inference

Petitioner next argues that trial counsel was ineffective for failing to request a tailored jury charge relating to the gang expert's testimony and request an adverse inference jury charge relating to the destruction of interview notes. (DE 1 at 24.)

#### a.  Tailored jury charge regarding MS-13 expert witness

Petitioner does not suggest what more trial counsel could have done on this issue. As Respondents argue, and as trial counsel testified at the PCR hearing, trial counsel argued emphatically and repeatedly against the admission of any gang testimony and, once it was admitted, to limit the scope of that testimony because it relied upon false statements made by Petitioner. Or, as Judge Ravin put it when rejecting that argument, the matter was not one for a jury instruction, but for counsel to argue in summation; counsel could, the judge pointed out,

nevertheless highlight for the jury "a weakness in the State's evidence…[specifically,] that the expert testimony relied upon false statements by Petitioner." (DE 9-23 at 26.) After a PCR evidentiary hearing, Judge Ravin found that trial counsel's failure to request the special charge did not render his assistance ineffective. (DE 9-23 at 26.) Judge Ravin found that a special charge would not "aid the jury's understanding," and in any event that trial counsel could (and did) cast doubt upon the reliability of the expert testimony without the aid of such a charge. (*Id.* at 27.)

Moreover, the parties collaborated upon the issue of sanitization of the MS-13 evidence. (DE 7 at 54-55). Indeed, the final charge not only addressed the jury's obligation to assess the credibility of the MS-13 allegations, but also that Petitioner's membership in MS-13 should be considered for its proper purpose, and did not mean that he committed the crimes alleged:

> There has been evidence in this case concerning MS-13 and [Petitioner] alleged membership in that gang. It will be up to you to determine if this evidence is credible or not. If you do find it credible, it will be up to you to determine if it has any relevance to a possible motive for the charges set forth in the indictment, or any other issues you may have to decide. I instruct you, however, that you can never use the evidence that [Petitioner] may be a member of MS-13 to conclude that petitioner has a predisposition to commit any crimes. As well, you can never use the evidence that [Petitioner] may be a member of MS-13 to conclude that [Petitioner] must be guilty of the crimes alleged in the indictment.

(DE 9-10 at 83-84.)

There is no indication that trial counsel did not effectively pursue this argument, or that any state court decision unreasonably or incorrectly applied federal law, and therefore no basis for habeas relief.

### b. Adverse inference regarding interview notes

Petitioner also alleges that trial counsel should have pursued, and Judge Ravin should have provided, an adverse inference charge to the jury regarding the destruction of officers' investigation notes. (DE 1 at 24.) Judge Ravin rejected this argument after a PCR hearing, holding that there was no prejudice to Petitioner. Specifically, Judge Ravin found that trial counsel did address the destruction of interview notes during cross-examination and that the jury was charged that "it is incumbent upon the State to preserve all relevant evidence in an investigation" and "that they could consider the lost interview in determining…credibility." (DE 9-23 at 30.) "[J]uries are presumed to follow their instructions ....," *Richardson v. Marsh*, 481

U.S. 200, 211 (1987), and I do not find the instruction that Judge Ravin gave to be contrary to, or an unreasonable application of, federal law. Accordingly, this ground also fails to provide a basis for habeas relief.

### 8. Ground Fourteen: Failure to object to N.A.'s testimony about sexual assault and comments regarding Petitioner's choice not to testify

Petitioner next argues that trial counsel failed to object when N.A. testified that she was assaulted by all of the defendants despite the fact that Petitioner was never charged with sexual assault. (DE 1 at 25.) Petitioner raised this claim before every state court during his PCR, so it may be deemed exhausted. The Appellate Division affirmed without elaboration based upon Judge Ravin's decision to reject this argument.

Judge Ravin accepted trial counsel's explanation that he wanted the jury to hear the testimony, which tended to cast doubt on N.A. precisely *because* Petitioner had not been charged with that sexual assault offense. (DE 9-23 at 17.) I see no basis to disturb this finding concerning trial counsel's strategy, and there was clearly no prejudice. Trial counsel asked for, and received, limiting instructions regarding that testimony both during N.A.'s testimony and during the final jury charges. (*Id.* at 31; DE 9-10 at 84 ("[Petitioner] is not charged with sexual assault. You may not consider this testimony for any other purpose than how it may affect her credibility.")) The jury is presumed to have followed that instruction.

Petitioner also argues that trial counsel was ineffective for failing to object to two alleged violations of Petitioner's right against self-incrimination: (1) the prosecutor's allusion to the failure of Petitioner "to provide answers"; and (2) a statement that "only the men who were there know." (DE 1 at 25.) Judge Ravin found that neither comment was a constitutional violation. The first referred to a defense witness, Dr. Morgan, not to Petitioner himself, and therefore did not violate Petitioner's right against self-incrimination. (DE 9-23 at 29.) The second comment referred to speculation about what one of the deceased victims might have seen that caused him to text his sister, N.A., to leave immediately. (DE 9-23 at 29.) Moreover, I note that Judge Ravin also instructed the jury that Petitioner's choice not to testify may not be considered "for any purpose, or in any manner" in arriving at a verdict" and "should not enter…deliberations or discussions in any manner, at any time. … He is presumed innocent, whether or not he chooses to testify." (DE 9-10 at 83.)

Trial counsel saw no basis to object at the time, and Judge Ravin, who was in the best position to judge the effect of these statements on the jury, did not perceive any error. Trial counsel's failure to object could not have been prejudicial. Accordingly, this ground does not provide a basis for habeas relief.

### 9.   Ground Fifteen: Appellate counsel's failure to raise multiple IA claims relating to trial counsel, and trial counsel's failure to state reasons for imposing VCCB penalty

Petitioner next argues that appellate counsel "failed to raise the ineffective assistance claims against trial counsel claims." (DE 1 at 26.) The familiar, two-prong *Strickland* standard applies to these claims. *Evitts v. Lucey*, 469 U.S. 387, 394-96 (1985).

Petitioner does not identify which claims appellate counsel allegedly failed to raise. If Petitioner is referencing here, as he did in his PCR, his gang expert and Fifth Amendment arguments, Judge Ravin denied those arguments in the last reasoned state opinion to discuss the matter. (DE 9-23 at 38-39.) Judge Ravin relied on the same reasoning discussed above, and I do the same. Because these arguments were meritless, appellate counsel was not ineffective for failing to raise them. Moreover, as Respondents argue, the claims alleging ineffective assistance of trial counsel are generally reserved for post-conviction relief proceedings, not asserted on direct appeal. *See State v. Precise*, 129 N.J. 451, 460 (1992).

Petitioner also argues that his Victims of Crime Compensation Board (VCCB) penalty is illegal. However, as Respondents argue in their third affirmative defense, that is not a cognizable habeas claim. *Tierno v. Superintendent Smithfield SCI*, No. 19-2120, 2019 WL 5966939, at *1 (3d Cir. Nov. 6, 2019) (citing *Estelle v. McGuire*, 502 U.S. 62, 63 (1991) ("It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Gentile v. Warren,* No. 11–6125, 2013 WL 85266, at * 15 (D.N.J. Jan.7, 2013) (finding habeas claim that alleges that state court failed to properly consider mitigating factors at sentencing is not cognizable as a federal habeas claim as it relates only to alleged violation of state law).

However, even if I considered it, I agree with Respondents that Petitioner would have been entitled, at best, to a remand for Judge Ravin to explain his reasons for doing so. Judge Ravin ultimately did so in his PCR decision, explaining that his imposition of the maximum VCCB penalty was justified by the severity of Petitioner's crimes. (DE 9-23 at 40.) Accordingly, there is no showing of prejudice, and this ground fails to justify habeas relief.

**D.  Ground Sixteen: Trial court's denial of new trial based on Jovel affidavit**

The Petition's final argument is that the trial court erred in denying a new trial after co-defendant Melvin Jovel submitted an affidavit in which he admitted to bringing a gun to the scene, killing a victim, and lying about Petitioner's guilt. (DE 1 at 27.) Petitioner raised this argument in his PCR and a concurrent motion for a new trial. When Judge Ravin denied the motion and PCR, Petitioner unsuccessfully appealed to the Appellate Division and New Jersey Supreme Court. (*Id.*)

As an initial matter, Respondents are correct that "this claim is not cognizable under the federal habeas statute because it rests on state, rather than federal, law. It has long been recognized that '[c]laims of actual innocence based on newly discovered evidence' are never grounds for 'federal habeas relief absent an independent constitutional violation.'" *Fielder v. Varner*, 379 F.3d 113, 122 (3d Cir. 2004) (quoting *Herrera v. Collins,* 506 U.S. 390, 400 (1993)). As Respondents argue, Petitioner does not assert any independent constitutional violation, and thus his claim is not cognizable on habeas.

That said, even if I considered the claim, I would nevertheless be compelled to reject it. After a hearing at which Jovel testified, Judge Ravin made extensive findings of fact in a lengthy written opinion. (DE 9-22 at 31.) I note also that Judge Ravin's factual findings are entitled to deference for the additional reason that he was the judge who presided over the trial and post-conviction hearings.

Judge Ravin ultimately found Jovel not credible. While Petitioner's trial counsel testified that he had heard of Jovel's potential interest in exculpating Petitioner, Jovel's attorney had not permitted Petitioner's attorney to speak with Jovel. (DE 9-23 at 31.) Judge Ravin found: (1) that it was unreasonable to believe that Jovel, an 18 year-old without prior criminal involvement, brought a gun, shot four people and somehow forced all of his co-defendants to commit these heinous crimes; and (2) that everything Jovel said at the evidentiary hearing was contradicted by the detailed statement he gave to police. Jovel's statement included his hearing Petitioner say that "it would be funny if N.A. was dancing with a bullet in her head" and his observation that Petitioner "brought the gun to the schoolyard." (*Id.* at 32.) Judge Ravin found that even if Jovel had been available, and even if he had testified, the jury would "not have discarded the

overwhelming evidence of Petitioner's guilt, particularly the statement of [Petitioner] and of Mr. Jordan, and found that Petitioner was not guilty." (DE 9-22 at 40.)

> The Appellate Division agreed:
>
> Judge Ravin held an evidentiary hearing, heard Jovel's live testimony, assessed his demeanor and found him incredible. In making that assessment, Judge Ravin considered Jovel's prior statement from 2007 that incriminated defendant, that Jovel had nothing to lose in changing his story because he had pled guilty and had been sentenced, and that Jovel and defendant were housed in the same prison unit. Moreover, Judge Ravin, as the trial judge, was very familiar with the evidence against defendant. He weighed Jovel's testimony against the "overwhelming [trial] evidence" and found that no reasonable jury would accept Jovel's testimony. On this record, we find no abuse of discretion in not granting a new trial.

*PCR Appeal*, 2018 WL 333490, at *4. I find no reason to disturb those conclusions. Accordingly, this ground also fails to provide a basis for habeas relief.

### E. Post-petition motions

#### 1. Motion to amend to add Grounds 17–20

##### a. Timeliness

Two years after he filed his reply, Petitioner sought to amend the Petition to assert new grounds, numbered Seventeen through Twenty. Respondents challenge the filing as untimely and meritless. I agree on both scores.

Generally, courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15. A petitioner should be afforded the opportunity to test his claim on the merits unless there is an "apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1964); *see Wright v. Jones*, 404 F. App'x 323, 325–26 (10th Cir. 2010) (affirming denial of amendment over two years after expiration of one-year AEDPA limitations period and declining to find equitable tolling). Undue delay and futility of amendment are the central concerns here.

Petitioner contends that he could not file his motion to amend his petition in the nine-year period from 2012 until 2021 because he could not exhaust his new claims before then. Petitioner explains that he had limited legal assistance because he was placed into protective custody

between 2010 and 2021, a "highly restricted housing unit where only selected prisoner paralegals with security clearance can enter." (DE 21 at 2.) According to Petitioner, he could not access his files between 2012, when the paralegal assisting him was terminated, and 2019, when he left protective custody and filed his second PCR petition. (*Id.* at 3.)

Petitioner's timeliness arguments are unpersuasive. First, the record is replete with evidence that Petitioner, without the aid of that paralegal, made numerous post-trial state court fillings between 2012 and 2019. Second, even assuming that Petitioner could not create and file a single document until his release from protective custody, he could have filed for a protective stay in 2019 pending exhaustion of his additional claims in state court. At any rate, if he had tried, or if I had accepted Petitioner's attempted amendment as timely, amendment would also be denied as substantively futile, for the reasons expressed below.

### b. Futility

**Ground Seventeen** challenges Petitioner's 245-year sentence as excessive. (DE 21-1 at 18-19.) As Respondents argue, however, this argument could have been raised earlier and, indeed, was raised, albeit in connection with his VCCB penalty. However, as discussed above, Petitioner's challenge to a state sentence as excessive is not cognizable on habeas.

**Ground Eighteen** asserts that "PCR counsel made numerous errors, and counsel's conduct undermined the proper functioning of adversarial process…" (DE 21-1 at 19.) Petitioner himself, however, recognizes that "there is no federal constitutional right to counsel in PCR proceedings." (DE 21 at 3 (citing *Coleman v Thompson*, 501 U.S. 722, 752 (1991)). *Martinez v. Ryan*, 566 U.S. 1, 14 (2012), cited by Petitioner, is not the basis for an independent claim as such; it holds only that inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial. And even in that context, Petitioner's burden "is a substantial one, which is to say that the prisoner must demonstrate that the [underlying IAC] claim has some merit." There is no indication of any such meritorious claim here.

**Ground Nineteen** alleges prosecutorial misconduct related to the communication data warrant, the trial prosecutor's mention of the warrant during summations, and the prosecutor's alleged misstatement at the PCR hearing regarding co-defendant Alfaro's implication of Petitioner as a gang leader. (*Id.* at 19-20.) These arguments retread the substance of Petitioner's

Ground Three: that the prosecutor lied to the jury by suggesting that Petitioner had a phone and destroyed it. This, says Petitioner, suggested to the jury that a phone existed but could not be accessed for potentially incriminating information. But as I discussed above when rejecting Ground Three, Judge Ravin and the Appellate Division explained why the phone argument failed: the jury was instructed, unambiguously, that the prosecutor was wrong about the phone, and was instructed not to consider it:

> "[Petitioner]…challenges the prosecutor's statement that …[Petitioner] had destroyed his phone, thus, suggesting [Petitioner] was impeding the police efforts. [Petitioner] objected and the State did not oppose the issue being addressed in a curative instruction. [Judge Ravin] explained to the jury:
>
>> [T]here was a reference in [the prosecutor's] summation that the police could not obtain a[c]ommunications [d]ata [w]arrant because [Petitioner] had destroyed his cellphone. As a matter of fact, a CDW could have been obtained to get the record of incoming and outgoing calls from the cellphone but the cellphone, itself, would not be able to be located. *Therefore, you should disregard that aspect of [the prosecutor's] argument*.

*Direct Appeal*, 2014 WL 1302366, at *10. There is no basis to disturb that determination.

There is only one substantive difference between Grounds Three and Nineteen. Ground Three alleges that the prosecutor misstated during *trial* that co-defendant *Carranza* implicated Petitioner in the attack, while Nineteen alleges that the prosecutor misstated during *PCR/new trial motion* proceedings that co-defendant/Petitioner's brother *Alfaro* implicated Petitioner. But Petitioner does not explain this distinction's impact, and I cannot discern any. Even assuming that Petitioner is factually correct, any error in *post*-conviction proceedings surely could not have affected the deliberations of the trial jury. Nor is it evident that the error affected the reasoning of Judge Ravin who, having been involved with the case for years, was familiar with its nuances. Judge Ravin characterized the evidence as "overwhelming," focusing not on the statements of Carranza or Alfaro, but those of Petitioner himself or Jordan, Petitioner's fellow inmate. (DE 9-22 at 40.)

**Ground Twenty** again alleges that the trial court erred by refusing to suppress Petitioner's statement to the police, this time relying on Jovel's post-trial statement admitting to shooting the victims. (*Id.* at 20.) Of course, Judge Ravin could not have erred in failing to consider a statement that Jovel did not make until years after the trial. More importantly,

42

however, Judge Ravin in the end did not find that statement credible. Again, this argument is a second attempt at an argument already rejected on multiple occasions (and above, in this opinion).

Accordingly, the motion to amend as to Grounds 17, 18, 19, and 20, to the extent not denied as untimely, will be denied as futile.

### 2. Motion for pro bono counsel

Based on the analysis above, Petitioner's request for pro bono counsel, likewise made over two years after he filed a reply, is both untimely and moot. It also fails for lack of a threshold showing of merit. Accordingly, I will deny the motion.

## V.    CERTIFICATE OF APPEALABILITY

A petitioner may not appeal from a final order in a habeas proceeding challenging a state conviction unless he has "made a substantial showing of the denial of a constitutional right." See 28 U.S.C. § 2253(c). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). I find that none of the claims raised in the Petition (or Amended Petition) meet this standard, and I will accordingly decline to issue a certificate of appealability.

## VI.    CONCLUSION

For the foregoing reasons, this § 2254 petition will be denied on the merits without a hearing, as the state record is sufficient to deny Petitioner's arguments. Petitioner's motions to amend and for pro bono counsel will also be denied. An appropriate order follows.

Dated: June 27, 2022

/**s**/ Kevin McNulty

_____

KEVIN MCNULTY
United States District Judge